46 F.3d 803
 40 ERC 1001, 63 USLW 2483, 25 Envtl.
L. Rep. 20,491
 UNITED STATES of America,* Plaintiff-Appellee,
v.
VERTAC CHEMICAL CORPORATION, Defendant-Appellant.
Hercules, Incorporated; Uniroyal Chemical, Limited; Defendants.
Standard Chlorine of Delaware, Inc., Third Party-Defendant.
ARKANSAS DEPARTMENT OF POLLUTION CONTROL AND ECOLOGY, Plaintiff,
v.
VERTAC CHEMICAL CORPORATION; Defendant-Appellant.
Hercules, Incorporated, Defendant.
 Nos. 94-1946, 94-1956, 94-1960, and 94-2006.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 14, 1994.
Decided Jan. 31, 1995.
 
 Scott Slaughter, Washington, DC, argued (Steve A. Weaver, Charles Moulton, Robert R. Ross, and Timothy Dudley, on the brief), for Vertac in 94-1946.
 W. Gordon Hamlin, Jr., Atlanta, GA, argued (E.A. Simpson, Jr., V. Robert Denham, Jr., LeAnn Jones, Ronald A. May and Charles L. Schlumberger, on the brief), for Hercules in 94-1956.
 Steven W. Quattlebaum, Little Rock, AK, argued (Susan H. Shumway, on the brief), for Uniroyal Chemical in 94-1960.
 Charles L. Moulton, Little Rock, AK, argued, for Arkansas Dept. of Pollution Control and Ecology in 94-2006.
 Vicki L. Plaut, Washington, DC, argued (Myles E. Flint, Paula J. Casey, A. Doug Chavis, John A. Bryson, John A. Sheehan, and Michael J. Cianci, Jr., on the brief), for appellee.
 Before McMILLIAN, WOLLMAN and HANSEN, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 Vertac Chemical Corp. (Vertac), the Arkansas Department of Pollution Control and Ecology (ADPCE), Hercules, Inc. (Hercules), and Uniroyal Chemical, Ltd. (Uniroyal) (collectively appellants), appeal from an interlocutory order entered in the United States District Court[1] for the Eastern District of Arkansas denying their motions for summary judgment and granting a cross-motion for summary judgment brought by the United States of America. United States v. Vertac Chem. Corp., 841 F.Supp. 884 (E.D.Ark.1993) (Vertac ). For reversal, appellants argue that the district court erred in holding that the undisputed facts establish as a matter of law that the United States cannot be held liable as either an operator or an arranger within the meaning of Sec. 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. Sec. 9607(a). Hercules additionally argues that the district court erred in holding that it is not entitled to immunity under Sec. 707 of the Defense Production Act of 1950 (DPA), 50 U.S.C. app. Sec. 2157, or implied indemnity from the United States. For the reasons discussed below, we affirm the order of the district court.Background
 
 
 2
 This case began as a cost recovery action brought by the United States under CERCLA against numerous potentially responsible persons associated with a former herbicide manufacturing facility located in Jacksonville, Arkansas (the Jacksonville facility). The present appeal arises from motions for summary judgment filed by Vertac, ADPCE, and Hercules, and a cross-motion for summary judgment filed by the United States. By memorandum opinion and order dated October 12, 1993, the district court granted the United States' motion and denied the motions brought by Vertac, ADPCE, and Hercules. Vertac, 841 F.Supp. 884. This appeal followed.[2]
 
 Undisputed Facts
 
 3
 The following summary of facts is largely taken from the district court's statement of undisputed facts.[3] See id. at 886-88. During the late 1950s, Reasor-Hill Corp. owned and operated the Jacksonville facility, where it manufactured, among other things, chemical herbicides known as 2,4-D[4] and 2,4,5-T.[5] In December of 1961, Hercules purchased the Jacksonville facility from Reasor-Hill. In 1964, in response to contract solicitation proposals published by the United States, Hercules submitted and won competitive bids to supply the United States with an herbicide known as Agent Orange, to be used as a defoliant in Vietnam. Hercules began producing Agent Orange, a mixture of the butyl esters of 2,4-D and 2,4,5-T, at the Jacksonville facility.
 
 
 4
 From 1964 through 1968, Hercules produced and supplied Agent Orange to the Department of Defense (DOD) under rated contracts or orders and directives issued pursuant to the DPA, 50 U.S.C. app. Sec. 2061 et seq. The DPA provides, among other things, that the President has authority to designate a contract or order as a "rated order" which shall take priority over the performance of any other contract or order, on grounds that it is deemed necessary or appropriate to promote the national defense. Rated orders may also require the suppliers of a government contractor to give the government contractor similar priority. A "directive" is an official action taken by the Department of Commerce (DOC) under its regulations. It requires a person to take an action or to refrain from taking an action and may take precedence over a rated or unrated contract, to the extent stated in the directive. The rated orders and directives issued to Hercules were subject to rules promulgated by the Business and Defense Services Administration, a unit of DOC.
 
 
 5
 The rated contracts contained standardized government contract terms and conditions. The contract specifications, which governed matters such as physical properties of the product, packaging, labeling, and quality control, were mainly developed by the United States Army. Hercules and other manufacturers were allowed some input regarding the contract specifications. While DOD allowed Hercules limited opportunities to negotiate and modify the terms of the contract specifications, the specifications remained substantially dictated by DOD.
 
 
 6
 The rated contracts also subjected Hercules to the terms of the Walsh-Healey Act, 41 U.S.C. Sec. 35. Under the Walsh-Healey Act, Hercules was required to meet certain health and safety standards. Regulations under the Walsh-Healey Act gave the Department of Labor authority to conduct random inspections at the Jacksonville facility, which it did on two occasions during the period Hercules was producing Agent Orange.
 
 
 7
 In 1967, the United States issued a directive ordering Hercules to accelerate its production and delivery of Agent Orange. As a result, Hercules devoted all of its efforts at the Jacksonville facility to producing Agent Orange. When Hercules was still unable to meet the United States' production demands, it contracted for the foreign importation of 2,4,5-T and 2,4-D. The government facilitated this importation by waiving import duties, pursuant to 10 U.S.C. Sec. 2383, which provided for duty-free treatment of emergency war materials purchased abroad.
 
 
 8
 None of the raw materials used by Hercules for the production of Agent Orange was ever owned or directly supplied by the United States. The United States did, however, issue directives to Hooker Chemical (Hooker), to ensure Hooker's supply of tetrachlorobenzene (TCB) to Hercules and other producers of Agent Orange. The United States also did not hold any financial ownership interest in the land, buildings, tools, machinery, or equipment used by Hercules during the time Hercules was producing Agent Orange. In fact, Hercules protected certain aspects of its Agent Orange production process as proprietary information. No representative of the United States ever hired, fired, disciplined, managed, or trained any Hercules personnel who worked on the production of Agent Orange.
 
 
 9
 The United States knew or should have known that the production of Agent Orange produced wastes. Some of the wastes generated by the production of 2,4,5-T contained hazardous substances, including dioxin. The rated contracts between Hercules and the United States did not address the manner in which Hercules was to handle wastes generated by the production of Agent Orange. Hercules chose to bury wastes generated by the production of 2,4,5-T on-site, which had been its practice before it began producing Agent Orange for the United States. Hercules chose to bury the wastes without consulting representatives of DOD or DOC. The United States did not take part in designing, performing, or supervising activities related to the handling, treatment, or disposal of wastes while Hercules owned and operated the Jacksonville facility.
 
 
 10
 Hercules profited from its sales of Agent Orange to the United States under the rated contracts. After Hercules stopped supplying Agent Orange to the United States, it continued to produce and sell to commercial customers other products manufactured with the use of 2,4-D and 2,4,5-T.
 
 Discussion
 
 11
 We review a grant of summary judgment de novo. The question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir.1992); St. Paul Fire & Marine Ins. Co. v. FDIC, 968 F.2d 695, 699 (8th Cir.1992). Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. Crain v. Board of Police Comm'rs, 920 F.2d 1402, 1405-06 (8th Cir.1990). In the present case, the district court held as a matter of law that, under the undisputed facts of the case, the United States cannot be held liable as either an operator or an arranger under 42 U.S.C. Sec. 9607(a)(2) and Sec. 9607(a)(3). Vertac, 841 F.Supp. at 890. The district court also held as a matter of law that Hercules is not entitled to immunity under the DPA or implied indemnity from the United States. Id. at 891. We agree.
 
 Operator Liability
 
 12
 Under CERCLA, there are four classes of responsible persons who may be held liable for response costs incurred by the United States or another person. 42 U.S.C. Sec. 9607(a). One class includes persons who operated a facility at the time hazardous substances were disposed of at the facility. Id. Sec. 9607(a)(2) (owners and operators of facility at time of disposal). This court recently addressed the legal standards for determining an individual's operator liability under Sec. 9607(a)(2) in United States v. Gurley, 43 F.3d 1188 (8th Cir.1994) (Gurley ). We determined under the facts of that case that an individual's actual exercise of control over the waste disposal activities conducted at a dump site resulted in personal liability under CERCLA. Id., 43 F.3d at 1192-95.
 
 
 13
 In the present case, we consider the legal standards for determining the government's operator liability under Sec. 9607(a)(2), which we view as similar to corporate liability. As noted in Gurley, 43 F.3d at 1192-93, the statute itself does not provide much guidance; it simply imposes liability upon "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. Sec. 9607(a)(2). The Third Circuit, however, recently addressed this precise issue and held that the United States was an operator under CERCLA in a case involving similar, but not identical, facts to those of the present case. FMC Corp. v. United States Dep't of Commerce, 29 F.3d 833 (3d Cir.1994) (en banc) (FMC ).[6] Upon review, we agree with the Third Circuit's conclusion that operator liability may result from actual or substantial control exercised by one entity over the activities of another. Id. at 843-45. Determining whether an entity has exerted such actual or substantial control requires a fact-intensive inquiry and consideration of the totality of circumstances. Id. at 845. In the present case, we hold that the United States cannot be held liable as an operator under CERCLA because it did not exercise actual or substantial control over the operations at the Jacksonville facility.
 
 
 14
 In FMC, the Environmental Protection Agency brought a CERCLA action against potentially responsible persons seeking response costs for cleaning up hazardous substances at a facility in Front Royal, Virginia (the Front Royal facility). The owner of the site, FMC Corporation (FMC), sought contribution from the United States pursuant to 42 U.S.C. Sec. 9613(f). FMC alleged that the United States was liable as an owner, operator, and arranger under 42 U.S.C. Secs. 9607(a)(2) and 9607(a)(3) because the War Production Board (WPB)[7] exercised control over the manufacture of high tenacity rayon at the Front Royal facility during the 1940s. Following a bench trial, the district court held that the United States was liable as an owner, operator, and arranger. On appeal, the Third Circuit affirmed, discussing only the United States' liability as an operator.[8] 29 F.3d at 843-45. The Third Circuit applied an "actual control" test for operator liability as set forth in its decision in Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209 (3d Cir.1993) (corporate liability). FMC, 29 F.3d at 843.
 
 
 15
 Under the "actual control" test, the Third Circuit considered whether the United States had exercised "substantial control" over the production of high tenacity rayon at the Front Royal site. That standard in turn required, at a minimum, "active involvement in the activities" at the Front Royal facility. Id. Based upon the specific facts of the case, the Third Circuit concluded that the United States had exercised actual control over the activities at the Front Royal facility during the relevant time frame. The Third Circuit reasoned as follows:
 
 
 16
 In our view, it is clear that the government had "substantial control" over the facility and had "active involvement in the activities" there. The government determined what product the facility would manufacture, controlled the supply and price of the facility's raw materials, in part by building or causing plants to be built near the facility for their production, supplied equipment for use in the manufacturing process, acted to ensure that the facility retained an adequate labor force, participated in the management and supervision of the labor force, had the authority to remove workers who were incompetent or guilty of misconduct, controlled the price of the facility's product, and controlled who could purchase the product. While the government challenges some of the district court's findings, it simply cannot quarrel reasonably with the court's conclusions regarding the basic situation at the facility. In particular, the government reasonably cannot quarrel with the conclusion that the leading indicia of control were present, as the government determined what product the facility would produce, the level of production, the price of the product, and to whom the product would be sold.
 
 
 17
 Id.
 
 
 18
 A key fact in FMC was that American Viscose, the owner of the Front Royal facility at the time high tenacity rayon was manufactured, had been ordered by the WPB to convert its facility to production of high tenacity rayon, rather than the regular textile rayon it had been producing. Id. at 836. In other words, American Viscose itself did not choose its product; "the government determined what product the facility would produce." Id. at 843. Thus, the United States was directly and entirely responsible for introducing a new manufacturing process at the Front Royal facility. That manufacturing process generated hazardous substances that were disposed of on-site. Moreover, the United States implemented the required plant conversion by leasing government-owned equipment and machinery and contracting with a third party to install the equipment at the Front Royal plant. Id. at 837. By contrast, in the present case, Hercules elected to bid for the Agent Orange government contracts. To the extent Hercules had to change its operations to produce Agent Orange, as opposed to other herbicides using 2,4-D and 2,4,5-T, those changes resulted from its own decision to seek the government's wartime business. Vertac, 841 F.Supp. at 886, 890.
 
 
 19
 Another important fact in FMC was that the United States "exerted considerable day-to-day control over American Viscose" during the relevant time period. FMC, 29 F.3d at 844. For example, the United States participated in managing and supervising workers, and even appointed a full-time representative to reside at Front Royal to address problems at the facility concerning manpower, housing, community services, and other related matters. Id. at 837. By contrast, in the present case, no representative of the United States ever managed or supervised any Hercules personnel during the relevant time period. Vertac, 841 F.Supp. at 888. Upon review, we hold that it cannot genuinely be disputed that the United States was never actively involved on a regular basis in, and thus never exerted substantial control over, operations at the Jacksonville facility while Hercules was producing Agent Orange. Moreover, the facts that Hercules was required to comply with the worker health and safety regulations under the Walsh-Healey Act, and that on two occasions inspectors visited the Jacksonville plant to investigate such compliance, are insufficient bases for imposing CERCLA liability on the United States as an operator of the facility. See, e.g., United States v. Dart Indus., Inc., 847 F.2d 144 (4th Cir.1988) (state environmental agency not an owner or operator of waste site under CERCLA despite allegations that agency issued permits for waste storage, performed inspections, and failed to effectuate a cleanup); United States v. New Castle County, 727 F.Supp. 854, 867-70 (D.Del.1989) (state's regulation of hazardous waste site insufficient to establish operator liability where state did not have a financial or proprietary interest in the site and did not actively participate in daily management and operations of the site).
 
 
 20
 In sum, the United States was not sufficiently involved, directly or indirectly, in the activities that took place at the Jacksonville facility to constitute actual or substantial control. Accordingly, we hold that, under the facts of the present case, the United States cannot be held liable as an operator of a facility under Sec. 9607(a)(2).Arranger Liability
 
 
 21
 CERCLA also imposes liability for response costs on "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances." 42 U.S.C. Sec. 9607(a)(3). This court addressed the legal standards for finding arranger liability under CERCLA in United States v. Northeastern Pharmaceutical & Chem. Co., 810 F.2d 726 (8th Cir.1986) (NEPACCO ), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987), and United States v. Aceto Agric. Chems. Corp., 872 F.2d 1373 (8th Cir.1989) (Aceto ). Appellants argue that the United States is an arranger under NEPACCO and Aceto because it had authority to control, and did control, many aspects of the production of Agent Orange. Upon review, we agree with the district court's analysis of this issue.
 
 
 22
 Liability under Sec. 9607(a)(3) requires, among other things, that the hazardous substances be "owned or possessed by" the person who arranged for the disposal. In NEPACCO, we explained that "[i]t is the authority to control the handling and disposal of hazardous substances that is critical under the statutory scheme.... We believe requiring proof of personal ownership or actual physical possession of hazardous substances as a precondition for liability under CERCLA Sec. 107(a)(3), 42 U.S.C. Sec. 9607(a)(3), would be inconsistent with the broad remedial purposes of CERCLA." 810 F.2d at 743. NEPACCO involved a question of whether or not a corporate employee could be found to have "owned or possessed" hazardous substances within the meaning of Sec. 9607(a)(3) by virtue of his specific responsibilities within the corporation, his knowledge of the hazardous nature of substances with which he was dealing, and the specific actions he took. In the present case, we must consider whether or not the United States "owned or possessed" hazardous substances within the meaning of Sec. 9607(a)(3) by virtue of its statutory authority under the DPA and the Walsh-Healey Act, its presumed knowledge that the production of Agent Orange was generating hazardous wastes, and the specific actions it took to facilitate Hercules' production of Agent Orange. Appellants maintain that the United States constructively possessed the hazardous substances disposed of at the Jacksonville facility because the United States had the authority to control, and did control, the product made at the facility and the raw materials necessary to make that product. We disagree.
 
 
 23
 To begin, we note that a governmental entity may not be found to have owned or possessed hazardous substances under Sec. 9607(a)(3) merely because it had statutory or regulatory authority to control activities which involved the production, treatment or disposal of hazardous substances. Our holding in NEPACCO, when read in the context of the facts of the case, certainly does not suggest such a broad interpretation. In NEPACCO, we concluded that a corporate employee constructively possessed the hazardous substances at issue because he, "actually knew about, had immediate supervision over, and was directly responsible for arranging for the transportation and disposal of the NEPACCO plant's hazardous substances." 810 F.2d at 743. In the present case, by contrast, the United States did not immediately supervise, or have direct responsibility for, the transportation or disposal of any hazardous substances generated at the Jacksonville facility. Vertac, 841 F.Supp. at 887-88.
 
 
 24
 Appellants maintain, however, that they are not merely relying on the United States' regulatory powers as a basis for asserting arranger liability under NEPACCO. They contend that it is the additional contractual relationship between Hercules and the United States, as governed by the DPA, that gives rise to the latter's liability as an arranger. We again disagree. As stated by the district court, "there is no dispute that Hercules actively sought Agent Orange contracts by participating in competitive bidding and that it made a profit from each contract." Vertac, 841 F.Supp. at 890. Moreover, "the relationship between the United States and the contractor under the DPA is one of buyer and seller, except that the buyer (i.e., the United States) has the power to require the seller to perform the contract and to give it priority over other contracts." Id. Finally, Hercules was given opportunities to negotiate some terms of the contract specifications and, as a result, some of those terms were changed or modified. Id. at 886. Thus, while NEPACCO certainly suggests that circumstances may exist where a government contract involves sufficient coercion or governmental regulation and intervention to justify the United States' liability as an arranger under CERCLA,[9] the undisputed facts in the present case do not support such a finding.
 
 
 25
 Appellants rely, in the alternative, on this court's decision in Aceto. In Aceto, the appellants, pesticide manufacturers, argued that they could not be liable as arrangers of hazardous waste disposal where the wastes were generated by an independent contractor whom they had hired to formulate technical grade pesticides into commercial grade pesticides. The complaint alleged that the appellants owned the technical grade pesticides used in the formulation, the work in process, and the resulting commercial grade product. 872 F.2d at 1378. On appeal, this court affirmed the district court's denial of the appellants' motion to dismiss, noting that the appellants actually owned the hazardous substances, as well as the work in process. Id. at 1381-82. In other words, the complaint alleged that, throughout the production process, the appellants retained actual ownership of the hazardous substances in question. Therefore, a claim of arranger liability had been sufficiently alleged, even though the appellants were never actually involved in the treatment or disposal of the hazardous wastes. Id. at 1382.
 
 
 26
 Appellants in the present case argue that Aceto applies because the United States (1) supplied the raw materials to Hercules for the production of Agent Orange by issuing directives to Hooker requiring Hooker to supply TCB to Hercules, giving Hercules authority to enter rated contracts with its suppliers, and waiving import duties for some of Hercules' foreign suppliers, and (2) constructively possessed the hazardous substances and the work in process by having the authority to control the supply of TCB, Hercules' production process, and the end product.
 
 
 27
 We agree with the district court's determination under Aceto that the United States did not supply the raw materials to Hercules and did not own or possess the raw materials or the work in process. See Vertac, 841 F.Supp. at 888-89. Although the United States took steps to facilitate Hercules' acquisition of TCB, the United States was never actively involved in supplying Hercules with any such raw materials. Nor did the United States own or have any financial interest in any of Hercules' suppliers. Cf. FMC, 29 F.3d at 837 (government built and retained ownership of sulfuric acid plant adjacent to facility to assure adequate supply of sulfuric acid). The facts simply do not support the conclusion that the United States actually or constructively supplied Hercules with its raw materials. It also cannot reasonably be inferred that the United States constructively owned or possessed the raw materials or the work in process that generated hazardous wastes at the Jacksonville facility. As previously discussed, the undisputed facts establish that the United States' actual involvement in the operations of the Jacksonville facility was sporadic and minimal.
 
 
 28
 Accordingly, we hold that, under the facts of the present case, the United States cannot be held liable under CERCLA as an arranger of hazardous waste disposal under Sec. 9607(a)(3).[10]
 
 Hercules' immunity and indemnity arguments
 
 29
 Hercules additionally argues on appeal that it is immune from CERCLA liability arising out of its performance of the Agent Orange contracts and that the United States has an implied duty to indemnify Hercules. The district court rejected these arguments in its summary judgment order without discussing its reasons. Vertac, 841 F.Supp. at 891. Upon careful review of the undisputed facts and the arguments presented on appeal, we affirm the district court's decision.
 
 
 30
 Hercules bases its immunity argument on Sec. 707 of the DPA, 50 U.S.C. app. Sec. 2157, which provides:
 
 
 31
 No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act [sections 2061 to 2071 of this Appendix], notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid. No person shall discriminate against orders or contracts to which priority is assigned or for which materials or facilities are allocated under title I of this Act [sections 2071 to 2076 of this Appendix] or under any rule, regulation, or order issued thereunder, by charging higher prices or by imposing different terms and conditions for such orders or contracts than for other generally comparable orders or contracts, or in any other manner.
 
 
 32
 Hercules argues that the language of Sec. 707 is clear and unambiguous and that nothing in its language supports an interpretation that would exclude Hercules' CERCLA liability, or any other liability, arising out of its performance of the Agent Orange contracts. In response, the United States argues that the language of Sec. 707 is not clear and unambiguous and that the interpretation advanced by Hercules would have the absurd result of allowing a government contractor to violate the laws with impunity, so long as it is performing a rated contract.
 
 
 33
 In Hercules, Inc. v. United States, 24 F.3d 188, 203-04 (Fed.Cir.1994) (Hercules ), the Federal Circuit was similarly required to examine the scope of the immunity provided by Sec. 707. The Federal Circuit considered the relationship between Sec. 707 and Sec. 101(a) of the DPA, 50 U.S.C. app. Sec. 2071(a), which authorizes the President to designate certain government contracts for priority over other contracts when necessary or appropriate to promote the national defense. Noting, as a general rule, that statutory provisions enacted together must be read harmoniously, the Federal Circuit reasoned "[t]o hold that section 707 protects contractors against a risk which is greater than that created by the statute with which it operates would violate this rule." 24 F.3d at 204. Accordingly, the Federal Circuit concluded "the protection afforded by section 707 of the DPA extends no further than the risk imposed by section 101(a) of the DPA." Id. We agree. Accordingly, we hold in the present case that Sec. 707 does not shield Hercules from liability it may have under CERCLA arising out of its performance of the Agent Orange contracts because such immunity would exceed the risk imposed by Sec. 101(a).[11] Accord United States v. General Dynamics Corp., 1988 WL 160862, 1988 U.S.Dist. LEXIS 17256 (N.D.Tex. June 9, 1988) (Sec. 707 immunity does not apply to liability under the Clean Air Act).
 
 
 34
 Hercules separately argues that it is entitled to indemnity from the United States arising out of Hercules' immunity under Sec. 707, the United States' waiver of immunity, and the United States' liability under CERCLA. Because Hercules is not entitled to immunity under Sec. 707, its implied indemnity argument must also fail. In light of our interpretation of Sec. 707, it cannot genuinely be disputed that the United States never implicitly promised to indemnify Hercules for the type of liability at issue in the present case. See Hercules, 24 F.3d at 204 (government's use of DPA to issue rated orders for production of Agent Orange did not create an implied-in-fact contractual obligation that government must indemnify contractor for tort liability to third parties).
 
 
 35
 Accordingly, we hold that Hercules is not entitled to immunity under Sec. 707 of the DPA or implied indemnity from the United States.
 
 
 36
 For the foregoing reasons, the order of the district court is affirmed.
 
 
 
 *
 Title per counsel. Because of multiple cross-, counter- and third-party issues, caption is 106 pages long. Full caption is on file with the Clerk's Office of the Eighth Circuit Court of Appeals in St. Louis, MO
 
 
 [1]
 The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas
 
 
 [2]
 The United States asserts that this court lacks jurisdiction to consider Uniroyal's arguments on appeal because Uniroyal failed either to join in the other appellants' motions for summary judgment or to oppose the United States' cross-motion for summary judgment. We note, however, that Uniroyal did "adopt by reference pursuant to Rule 10(c) of the Federal Rules of Civil Procedure the responses of the State [of Arkansas], Vertac and Dow to the Motion for Summary Judgment of the United States." See Appellee's Supplementary Appendix at 139. That adoption is sufficient to confer appellate jurisdiction, and we have considered Uniroyal's arguments to the extent they are within the proper scope of issues on appeal
 
 
 [3]
 Appellants do not argue that the district court erred in stating the undisputed material facts. Rather, they maintain that the district court erred in applying the law
 
 
 [4]
 2,4-D is 2,4-dichlorophenoxyacetic acid
 
 
 [5]
 2,4,5-T is 2,4,5-trichlorophenoxyacetic acid. The manufacture of 2,4,5-T creates a by-product known as TCDD or dioxin
 
 
 [6]
 FMC Corp. v. United States Dep't of Commerce, 29 F.3d 833 (3d Cir.1994) (en banc) (FMC ), had not been decided at the time the district court rendered its decision in the present case
 
 
 [7]
 The War Production Board was later subsumed within the Department of Commerce
 
 
 [8]
 By an evenly divided vote, the Third Circuit also affirmed, without discussion, the district court's holding that the United States was liable as an arranger under Sec. 9607(a)(3). FMC, 29 F.3d at 845-46
 
 
 [9]
 Cf. FMC, 29 F.3d at 845-46 (affirming without discussion the district court's ruling that the government was liable as an arranger under CERCLA)
 
 
 [10]
 Our conclusions that the United States is neither an operator nor an arranger under CERCLA obviates the need to address the United States' sovereign immunity arguments
 
 
 [11]
 We agree that Sec. 707 "provid[es] a defense for a DPA contractor against a suit by a non-government customer in the event that the DPA contractor is forced to breach another contract to fulfill the government's requirements." Hercules, Inc. v. United States, 24 F.3d 188, 203 (Fed.Cir.1994). However, we do not comment on the extent to which Sec. 707 might provide immunity under other circumstances not presented in this case