ACC CHEMICAL COMPANY,
et al., Plaintiffs,

v.

HALLIBURTON COMPANY, Defendant.

Civil No. 3–92–70178.

United States District Court,
S.D. Iowa,
Davenport Division.

Oct. 4, 1995.

David J. Meloy, Stanley Lande & Hunter, Muscatine, IA, Thomas A. Smart, Kaye Scholer Fierman Hays & Handler, New York City, John C. Hendricks, Stanley Lande & Hunter, Davenport, IA, Paul A. Zevnik, Williams & Zevnik, New York City, Daniel H. Williams, III, Bleakley Platt & Schmidt, White Plains, NY, for plaintiffs.

J. Hobart Darbyshire, Carlin Hellstrom & Bittner, Davenport, IA, Lawrence H. Schwartz, Stephen E. Williams, Bayh Connaughton Fensterheim & Malone, Washington, DC, for defendant.

## RULINGS ON MOTIONS FOR SUMMARY JUDGMENT AND ORDERS

VIETOR, District Judge.

Plaintiffs ACC Chemical, Four Star Oil & Gas, Getty Chemical, Primerica Corporation, Skelly Oil, and the City of Clinton, Iowa bring suit against defendant Halliburton for cost recovery and contribution under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.* (counts I—III of the complaint), and indemnification under state law (count IV of the complaint). Halliburton counterclaims for indemnification and breach of hold harmless agreements.

Halliburton moves for summary judgment on plaintiffs' claims, seeking dismissal of the complaint, and also seeking summary judgment on its counterclaims. Plaintiffs move for partial summary judgment establishing Halliburton's liability, leaving only the amount of damages to be determined at trial. The motions are resisted and oral arguments have been heard.

### Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Johnson v. Schopf,* 669 F.Supp. 291, 295 (D.Minn.1987).

Summary judgment is appropriate only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Kopp v. Samaritan Health System, Inc.,* 13 F.3d 264, 268 (8th Cir.1993).

### Facts

The facts in this case are largely undisputed. In 1968, Skelly Oil and American Can formed Chemplex, a joint venture to manufacture polyethylene near Clinton, Iowa. Plaintiffs are participants in the Chemplex venture and other parties currently responsible for the former Chemplex site under an Administrative Order and a Consent Decree with the United States Environmental Protection Agency (EPA).

From startup until at least 1975, Chemplex experienced clogging in its low density polyethylene lines caused by partially solidified product. Such clogging required that a solvent be pumped through the lines at high pressure, in this case, perchloroethylene (known as "perc" or PCE). Perc had been recommended to Chemplex by its manufacturer, DuPont. A manager at Chemplex, Monte Reed, was also familiar with perc from his work at a polyethylene plant in Texas. Perc is a hazardous substance under CERCLA.

When its venture began, Chemplex did not have a pump with sufficient pressure to flush out the lines. Halliburton, an oil field services company, had a truck-mounted high pressure pump. Beginning in 1968, Halliburton was called by Chemplex to use its high pressure pump to help clean Chemplex's lines. In 1969–70, Chemplex built its own "flush rig." After that, Chemplex did most of its own cleaning, calling Halliburton only when the lines were severely clogged and a stronger pump was needed. Every time Halliburton assisted in the pumping of perc, Chemplex supplied the perc; Halliburton never supplied any perc. To the extent that Halliburton performed industrial cleaning services, it generally worked with acids and alkalines rather than chlorinated solvents like perc. When Halliburton provided its pump to clean Chemplex's lines, Chemplex chose the solvent and dealt with the solvent supplier. Chemplex never asked Halliburton how to use or dispose of perc, although Chemplex believed Halliburton had expertise in the area.

When Chemplex needed Halliburton's pump, it called the Halliburton facility in Dwight, Illinois, near Chicago. During this call, Chemplex provided Halliburton with the details of the work to be done. A Halliburton employee recorded the information about the job on a Halliburton call sheet. The details of the job were also memorialized in Chemplex purchase orders, which were sent to Halliburton by the Chemplex purchasing department. These purchase orders contained a hold harmless agreement making vendors liable for any work they performed on, or product they brought to, the Chemplex site.

In response to the call, two to four Halliburton personnel drove the pump truck to Chemplex. They checked in with the guard at the security gate who called the appropriate maintenance employee, who met the Halliburton team at the gate. Halliburton then presented the "Halliburton Industrial Cleaning Service Contract and Treatment Data Sheet," referred to as the work order. This order recited the work to be done as discussed during the phone call.

The purpose of the work order was to record the type of job and to ensure indemnification for Halliburton. Chemplex personnel always signed the work orders. The work orders contained indemnification language at the bottom of the front page, in red lettering. This agreement required the buyer of Halliburton's services to hold Halliburton harmless for any liability that arose as a result of Halliburton's presence or operations. The agreement was never discussed with Chemplex's plant manager or any person explicitly authorized to abridge any legal rights of Chemplex. There is no evidence that copies of the signed Halliburton work orders were provided to Chemplex for its records or for the review of Chemplex management.[1]

---

**1.** A substantial disagreement exists as to the facts surrounding these conflicting indemnification

Because of the dangerous nature of the operations at Chemplex, Chemplex closely supervised Halliburton. After Halliburton checked in and received the proper permits to do "hot work" (work in potentially dangerous areas), Chemplex workers led Halliburton to the low density unit in the eastern portion of the Chemplex site. Drums of perc were already at the job site or were delivered subsequently by Chemplex employees. Chemplex supervised the connection of Halliburton's pumping equipment to Chemplex's pipes through specially designed connectors set up by Chemplex.

The pump truck used by Halliburton was a flatbed outfitted with large pumps and large tanks for holding the liquid that went into the pumps. A forklift poured drums of perc into the tanks. When Halliburton cleaned the pipes at Chemplex, 400–500 gallons of perc was poured into each of two tanks mounted on Halliburton's truck. Once full, Chemplex provided a coil heater to be placed in the tanks to warm the perc. At least two Halliburton employees handled the cleaning process, which lasted one to two days. The recirculated perc, containing plastic residue, was pumped back to the truck in a "closed loop" until the pumps were shut off. When the operation was complete, Chemplex personnel generally directed Halliburton to pump the used perc from the truck tanks back into the drums in which it was originally supplied.

There is a dispute as to whether, on some occasions, Halliburton instead transported the used perc to Chemplex's landfill in the far western portion of the site and emptied the used perc from the tanks into the landfill.[2] Halliburton claims that the tanks on the truck were lightweight metal and could not have withstood motion while filled with perc. Because moving with loaded tanks could have broken the frame of the truck, it was Halliburton's policy to never transport liquids.

Plaintiffs allege that at least one person witnessed the trucks carrying tanks of perc to the landfill. Chemplex alleges that Halliburton's trucks were sturdy enough to take perc the short distance from the production areas of the Chemplex plant to the landfill at the western portion of the site. It was faster and more convenient to dump the truck tanks in the landfill as opposed to pumping back into drums. In 1968, DuPont, manufacturer of perc, instructed that to dispose of perc a user should spread it on the ground or in evaporation pits and let it evaporate. Throughout the time relevant to this case such disposal was the accepted method in the industry. It is undisputed, however, that *if* Halliburton dumped perc into the landfill, it did not choose that location but rather was directed there by Chemplex.

After the used perc was pumped off of the truck, Halliburton left the site taking no perc with them. The Chemplex personnel stored the perc or disposed of any refilled barrels. At all times during the cleaning process, Chemplex owned the perc. Chemplex personnel told Halliburton when to pump, when

agreements. Because this ruling as it applies to plaintiffs' complaint does not rely on the contract claims of either party, these areas of dispute are not material, and additional facts regarding the alleged contracts are unnecessary. The dispute over the formation of a contract *is* material to count IV of plaintiffs' complaint and to Halliburton's counterclaims. This fact dispute might well preclude granting summary judgment on those claims and counterclaims. The court does not reach those issues, however, for reasons stated at the conclusion of this opinion.

2. There is also a factual dispute as to whether perc was released at the eastern portion of the Chemplex site. This release allegedly occurred through spilling and leaking when the pump truck was being connected and disconnected to the plant by temporary piping, and when the perc was being pumped back into its original

barrels. Halliburton disputes the contention that it spilled perc on the ground or that perc leaked during the pumping operation.

I have not elaborated on the facts relating to the alleged "eastern release" for the following reasons. Plaintiffs' evidence on this is very slight. Moreover, plaintiffs' complaint very specifically indicates that the suit involves the alleged dumping of perc at the landfill at the western portion of the Chemplex site. *See* Complaint ¶ 13, 29. Even under the minimal requirements of notice pleading, defendant was arguably not apprised of the need to engage in discovery or argument regarding its actions at the eastern portion of the site. Ultimately, however, under the analysis below, neither party's facts or arguments regarding the eastern portion of the site would change the outcome.

to stop to switch systems, and when the operation was complete. Halliburton at all times retained actual control over its personnel and equipment.

By 1973, Chemplex had begun recycling its used perc. Prior to that, however, Chemplex policy was to dispose of perc and its other industrial wastes in its own landfill. Chemplex did this, and also on occasion dumped full barrels of waste directly into the landfill. Because perc has a heavier specific gravity than water and many other liquids, perc would settle below other liquids in the landfill and not evaporate.

The EPA has ordered plaintiffs to investigate and remediate soil and groundwater contamination at the former Chemplex site. Perc is the biggest contamination problem at the site. Plaintiffs have incurred and will continue to incur substantial response costs to comply with the EPA requirements.

### Discussion

Plaintiffs claim that this court should, as a matter of law, find defendant liable under CERCLA. Defendant claims that on the undisputed facts, it should be absolved of all liability under the statute. Determining who is correct begins with looking carefully at the framework CERCLA establishes for determining liable parties.

■ The Eighth Circuit recently set out the steps of a CERCLA analysis in *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930 (8th Cir.1995).

> We begin our discussion, as we must, with the language of the statute. Recovery of response costs by a private party under CERCLA is a two-step process. Initially, a plaintiff must prove that the defendant is liable under CERCLA. Once that is accomplished, the defendant's share of liability is apportioned in an equitable manner.

*Id.* at 934–35. To demonstrate liability under CERCLA, a plaintiff must show that a defendant is within one of the four classes of covered persons enumerated in 42 U.S.C. § 9607(a); that a release or threatened release from a facility has occurred; and that the plaintiff incurred response costs as a result. *Id.* at 934; *see also United States v.*

*Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1378–79 (8th Cir.1989). The four classes of liable parties under CERCLA are

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person * * *.

42 U.S.C. § 9607(a).

It is undisputed that there was a release or threatened release of hazardous substances at the Chemplex site, and that the release has caused plaintiffs to incur response costs. The question central to this case is whether Halliburton fits into one of the four categories of covered persons under CERCLA with respect to the release at the Chemplex site.

The record is clear that Halliburton is not at present an "owner or operator of a vessel or a facility" from which there is a release or a threatened release which causes response costs. *See Id.* § 9607(a)(1). The parties dispute Halliburton's liability under each of the remaining three categories: past owner or operator under subsection (a)(2); generator or arranger under subsection (a)(3); and transporter under subsection (a)(4).

### Past Owner or Operator Liability

■ In attempting to show past owner or operator liability, plaintiffs argue that Halliburton owned the pump truck, and furthermore that perc was pumped from the truck into barrels or the landfill (or leaked from the truck), a release under CERCLA.

A motor vehicle may be a facility under CERCLA. 42 U.S.C. § 9601(9). Halliburton correctly responds, however, that the truck is not the facility in question in this case. The facility is "the place where the hazardous substances were disposed of and where the government has concentrated its clean-up efforts." *United States v. Northeastern Pharmaceutical & Chem. Co., Inc.,* 810 F.2d 726, 743 (8th Cir.1986) ("NEPAC-CO").

The focus of the owner-operator analysis must be limited to the Chemplex site. Plaintiffs do not allege that Halliburton had any ownership interest in the Chemplex site. The facts in the summary judgment record also fail to establish that Halliburton had the type of control over operations at the Chemplex site that would raise a fact question as to whether they were an operator of the facility. *See United States v. Vertac Chemical Corp.,* 46 F.3d 803, 809 (8th Cir.1995); *Acme Printing Ink Co. v. Menard, Inc.,* 870 F.Supp. 1465, 1484 (E.D.Wisc.1994) ("In order to be an operator under CERCLA, a party must exercise some kind of day-to-day control over operations at the site."). Halliburton estimated at oral hearing that it was at the Chemplex site only thirty times in ten years of assisting Chemplex. It is clear from the undisputed facts that Halliburton cannot be liable for response costs at the Chemplex site under the past owner-operator theory of liability.

**Generator or Arranger Liability**

■ Section 9607(a)(3) imposes liability on "any person who by contract, agreement, or otherwise arranged for disposal or treatment * * * of hazardous substances owned or possessed by such person * * *." Plaintiffs argue that Halliburton meets this description because Halliburton

"arranged for" disposal of PCE by pumping waste PCE, contaminated with plastic flushed from Chemplex's pipes, into barrels, and then discarding the barrels at the Chemplex site. * * * Halliburton clearly wanted Chemplex to dispose of them.

Brief in Support of Plaintiffs' Motion at 14. Even if Halliburton did precisely what plaintiffs allege, this does not suggest that Halliburton arranged for disposal of a substance that it "owned or possessed." Chemplex owned the perc at all relevant times. Chemplex supplied the perc in barrels, it was Chemplex's plastic residue that was added to the perc in the cleaning process, and when the process was complete Chemplex's perc was placed back into Chemplex's barrels. Halliburton never had any right of control—even if one considers Halliburton in physical possession of the perc while it passed through the pump—to make disposal decisions. It is this authority to control the substance and its disposal that is the critical test. *See Vertac,* 46 F.3d at 810; *NEPAC-CO,* 810 F.2d at 743.

Plaintiffs suggest that the *Aceto* case and *United States v. Summit Equip. & Supplies, Inc.,* 805 F.Supp. 1422 (N.D.Ohio 1992) support its position. Those cases are clearly distinguishable in that the defendants in each case owned the hazardous substance, either prior to or contemporaneously with the disposal. In the *Aceto* case in particular, the defendants were similarly situated to the *plaintiffs* in the present case: the *Aceto* defendants owned hazardous materials on which a third party (Aidex) performed processes resulting in waste products. *See Aceto,* 872 F.2d at 1381. A closer analogy to the present case would be *United States v. Cello-Foil,* 848 F.Supp. 1352 (W.D.Mich.1994). In that case, companies who purchased hazardous materials in drums, and paid a deposit on those drums, were not liable as arrangers when they returned the drums—with some hazardous material left in them—to the seller in exchange for the return of their deposits. *Id.* The argument for arranger liability is weaker in the present case because at no time did Halliburton own or make perc, or use perc for its own benefit.

It is important to both the legal analysis and the equities of the case that, unlike the defendants in *Aceto,* Halliburton did not manufacture, formulate, sell, or deliver any perc or otherwise add to the amount of hazardous material that Chemplex would have used to clean its pipes regardless of who provided the pump. The pump itself did not add anything to the quantity or quality of the hazard at the Chemplex site. Halliburton's role is not, in any common sense understand-

ing of the terms, that of a generator or arranger of disposal of hazardous substances. I conclude that Halliburton is not liable under 42 U.S.C. § 9607(a)(3).

**Transporter Liability**

██ The final type of party that may be liable under CERCLA is a transporter. A party is liable as a transporter under section 9607(a)(4) if it ultimately selects the disposal facility or when it is deemed to have selected the facility because it

> actively participates in the disposal decision to the extent of having had substantial input into which facility was ultimately chosen. The substantiality of the input will be a function, in part, of whether the decisionmaker relied upon the transporter's [input]

*Tippins, Inc. v. USX Corp.*, 37 F.3d 87, 94–95 (3d Cir.1994) (footnote omitted); *see United States v. Hardage*, 985 F.2d 1427, 1435 (10th Cir.1993) (transporter liability is predicated on site selection by the transporter). "A transporter does not select the disposal site merely by following the directions of the party with which it contracts." *Tippins*, 37 F.3d at 95.

There is no evidence in the record to establish that Halliburton selected, on its own, either the original barrels or the Chemplex landfill as a place to empty the perc from its tanks. There is evidence in this case, however, that Chemplex directed Halliburton to use the landfill. *See* Exhibits to Defendant's Response to Plaintiffs' Motion, Statement of Raymond Meyerman at 5 (Meyerman, a Chemplex employee, admits directing Halliburton to dump perc in the landfill.); Exhibit C to Plaintiffs' Resistance to Halliburton's Motion, Deposition of Raymond Meyerman at 133 ("We tried to get them to dump it so that it crossed as much of the spent lime as it could * * *."). There is no evidence in the summary judgment record to indicate that Halliburton chose, without Chemplex's direction, a site on Chemplex's property to dump waste.

Because the undisputed facts show that Halliburton did not make, or participate in, the selection of the disposal site for the used perc, it cannot be liable under CERCLA as a transporter.

**Rulings and Order**

Plaintiffs' motion for partial summary judgment is **DENIED**. Defendant's motion for summary judgment is **GRANTED** as to the CERCLA claims in plaintiffs' complaint.

**IT IS ORDERED** that the CERCLA claims in counts I, II, and III of plaintiffs' complaint are **DISMISSED**.

The sole basis asserted in plaintiffs' complaint for federal subject matter jurisdiction is 42 U.S.C. §§ 9607 and 9613(b), and, for the state law claim, "pendent jurisdiction" (now "supplemental jurisdiction"). Defendant has not included any statement of jurisdiction in its state law counterclaims. Plaintiffs' count IV and defendant's counterclaims are, therefore, before the court only on the basis of supplemental jurisdiction. "The district courts may decline to exercise supplemental jurisdiction over a claim * * * if * * * * (3) the district court has dismissed all claims over which it has original jurisdiction * * *." 28 U.S.C. § 1367(c).

**IT IS ORDERED** that the state law claim in count IV of plaintiffs' complaint and defendant's state law counterclaims are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367(c)(3). Accordingly, this court does not rule on either motion for summary judgment to the extent that they relate to count IV of the complaint or to the counterclaims.

The parties' attention is invited to the provisions of 28 U.S.C. § 1367(d).

The final pretrial conference scheduled before Magistrate Judge Walters at 12:00 noon on October 6 is, of course, cancelled. Judge Walters will, however, make himself available to the parties at that time for a settlement conference. If the parties desire a settlement conference at that time, they should promptly contact Judge Walters' chambers.