**EAST BAY MUNICIPAL UTILITY DISTRICT, Appellant,**

v.

**UNITED STATES DEPARTMENT OF COMMERCE, et al., Appellees.**

No. 97–5079.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 17, 1998.

Decided May 1, 1998.

---

Andrew L. Lipps, Washington, DC, argued the cause, for appellant. With him on the briefs were Leonard A. Miller, Washington, DC and William J. Mertens.

Joan M. Pepin, Attorney, U.S. Department of Justice, argued the cause, for appellees. With her on the brief were Lois J. Schiffer, Assistant Attorney General, Edward J. Shawaker, Washington, DC, and Martin F. McDermott, Attorneys. John T. Stahr, Attorney, entered an appearance.

Before: WILLIAMS, HENDERSON and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The East Bay Municipal Utility District (the "District") found itself saddled with the costs of cleaning up hazardous waste from an abandoned mine site, Penn Mine, in Northern California. As owner of part of the site, which it acquired in developing its reservoir system, the District had become responsible for these costs under CERCLA, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. Understandably interested in finding another source of funds to share the burden, the District claimed that the federal government was responsible for the waste as an "operator" of the mine, pursuant to CERCLA § 9607(a)(1), or alternatively as an "arranger" of the mine's wastes, pursuant to § 9607(a)(3). Although hands-on control of the mine was exercised at all relevant times by Eagle Shawmut Mine ("Shawmut"), a partnership that leased the mine from Penn Mining Company, the District claims that the government stepped into the "operator" and "arranger" roles through a variety of measures it employed during and shortly after World War II, all aimed at assuring the

production of zinc, a critical ingredient in armaments.

The government's activities are set forth in great detail in the district court opinion, *East Bay Mun. Util. Dist. v. United States Dep't of Commerce*, 948 F.Supp. 78 (D.D.C.1996), and we will return to them later. For now it is enough to say that its interventions took two fundamental forms. First, it offered Shawmut incentives, in the form of a purchase agreement at premium prices (prices in excess of otherwise applicable wartime price controls), accompanied by a loan to finance the mine's reopening. Second, it lowered the opportunity costs of operating the mine as a zinc supplier by restricting the alternative use of both natural and human resources needed for production. This second class of interventions included strict limits on the use of mines for production of gold and regulations tending to lock workers into the mining industry generally and to funnel them specifically towards favored facilities such as Penn Mine.

The United States defended on the grounds that CERCLA's provision for waiver of the federal government's sovereign immunity, § 9620(a)(1), precluded considering any of its regulatory activities—i.e., the price and labor controls, the restrictions on gold mining—in the calculus of whether it had been an operator. The government also argued that, even if its regulatory activities were considered, its involvement in the mine did not place it in the role of an operator or arranger. On cross-motions for summary judgment based on jointly agreed facts, the district court rejected the government's narrow construction of the waiver but nonetheless found it not to have become an operator or arranger. 948 F.Supp. at 79. The District appeals the denial of the operator liability claim.

■ We affirm. We hold that the waiver of immunity contained in § 9620(a)(1) is coextensive with the scope of the substantive liability standards of CERCLA. Here, however, the government's actual involvement did not constitute "operat[ion]" of Penn Mine under either the prevailing "actual control" or the alternative "authority to control" interpretation of that term.

\* \* \*

CERCLA's waiver of immunity for the federal government, located in a section dealing with "Federal facilities," provides that:

Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title.

42 U.S.C. § 9620(a)(1). In turn, § 9607(a)(2) establishes liability for all remediation costs resulting from the release of a hazardous substance, for "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." Thus, CERCLA clearly exposes the federal government to suit and potential liability for at least some cases in which it operated a facility that discharged hazardous waste. See *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 10, 109 S.Ct. 2273, 2279, 105 L.Ed.2d 1 (1989), *overruled on other grounds by Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

■ The District contends that § 9620's waiver of sovereign immunity extends to any instance in which the federal government may be deemed to have operated a facility, regardless of whether the government acted in a regulatory or in a proprietary capacity. The government reads the waiver as leaving it immune for acts performed in a regulatory capacity. This alleged residual immunity, of course, is relevant only for acts that are otherwise "operational," i.e., acts that would make a private actor an "operator" of a facility. On the government's theory, Congress has waived immunity under CERCLA only for those activities which could be performed by "any nongovernmental entity," but has retained immunity for such "uniquely and inherently sovereign" activities as imposing the price and labor regulations which are part of the basis of the District's operator claim here. It relies on the general principle

that waivers of sovereign immunity are to be construed narrowly, including waivers likening the government's liability to that of a private party. See, e.g., *Library of Congress v. Shaw*, 478 U.S. 310, 318, 106 S.Ct. 2957, 2963, 92 L.Ed.2d 250 (1986) (saying, in analysis of clause making the government liable for costs "the same as a private person," that "we must construe waivers strictly in favor of the sovereign, and not enlarge the waiver beyond what the language requires") (internal citations and punctuation omitted); *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972) (construing FTCA waiver of immunity under which the government, "if a private person, would be liable," not to reach ultrahazardous strict liability claims, although private party would be liable under common law).

■ Because the terms of the government's consent to be sued in any court "define that court's jurisdiction to entertain the suit," *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941), the claim of immunity is jurisdictional. Here, however, the waiver clause does not preclude our jurisdiction to entertain *the suit*, for as the government acknowledges, and as is plain, the clause waives the government's immunity at least insofar as the District's claim is grounded in such typically private activities as the financing of the mine and the purchasing of zinc.

Our circuit has sometimes been ready to resolve a suit on the merits against a party asserting jurisdiction, where the merits issue was a no-brainer and the jurisdictional issue quite difficult. See, e.g., *Cross–Sound Ferry Services, Inc. v. I.C.C.*, 934 F.2d 327, 333 (D.C.Cir.1991); but see *id.* at 339 (Thomas, J., concurring) (rejecting majority's choice to dispose of claim on merits rather than to treat threshold jurisdictional issue). The Supreme Court has recently rejected that practice. See *Steel Company v. Citizens for a Better Environment*, —— U.S. ——, —— – ——, 118 S.Ct. 1003, 1012–16, 140 L.Ed.2d 210 (1998). We are uncertain whether *Steel Company*'s holding requires us to resolve the government's waiver claim first, when, as here, even the merits evidence that would be excluded under the government's waiver theory comes nowhere near establishing liability, and when we are certain of our jurisdiction over the suit itself. Nonetheless, the more cautious approach is first to tackle the government's theory on the limits of the immunity waiver.

■ It is true that there is a potential ambiguity in § 9620(a)(1)'s qualifying clause, "in the same manner and to the same extent ... as any nongovernmental entity." "[A]s any nongovernmental entity" can either be read broadly, to deprive the government of any immunity or defense not enjoyed by a nongovernmental entity that otherwise meets the criteria of § 9607; or, it can be read narrowly, as the government contends, so that it is liable for actions that trigger liability under § 9607—owning or operating a facility, or arranging for waste disposal—only when it performs those actions through the "proprietary" powers it shares with private entities, such as by exercising contractual or property rights.

Under the government's view, it would be liable when it exercised the sort of direct and detailed control that renders someone an operator through contract and property arrangements but not when it exercised *identical* control powers through coercive, administrative measures. As we understand this position, the government would be liable in the proprietary case even if (as would be typical, we suppose) its *ability* to exercise the controls through proprietary means ultimately flowed from its use of the sovereign tax power to fund the acquisition of the pertinent property rights or the fulfillment of its contract obligations.

But the language of § 9620(a)(1) does not welcome the government's reading. By providing that the government is liable "in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity" whenever it satisfies the criteria of § 9607, it does not on its face suggest a distinction between the exercise of private (what we are calling "proprietary") and regulatory powers.

Further, CERCLA's strong tendency to focus on the substance of the government's (or any entity's) activities, rather than their

form, cuts against the government's view. This comparative disregard for the formal relationships between the potentially responsible party and the facility is manifest in the very imposition of liability upon the category of "operators," whose role is defined functionally, not in terms of "the legal structure of ownership." See *United States v. Kayser-Roth Corp., Inc.*, 910 F.2d 24, 26 (1st Cir. 1990); see also *Schiavone v. Pearce*, 79 F.3d 248, 253–54 (2d Cir.1996).[1] Similarly, CERCLA excludes from "owner or operator" liability a secured creditor who holds "indicia of ownership" primarily to protect its security interest but does not "participat[e] in the management of a vessel or facility," 42 U.S.C. § 9601(20)(A); participation in management is in turn defined as *"actually* participating in the management or operational affairs of a vessel or facility." 42 U.S.C. § 9601(20)(E), (F)(i) (emphasis added), *as amended by* Asset Conservation, Lender Liability, and Deposit Insurance Protection Act of 1996, Pub.L. No. 104–208, Tit. II, § 2502(b), 110 Stat. 3009–464; see also *In re Bergsoe Metal Corp.*, 910 F.2d 668, 672 (9th Cir.1990) (interpreting pre-amendment definition to same effect).

A difficulty with anything other than a straightforward reading of the immunity waiver is the uncertainty entailed by the government's reading. As the Supreme Court has noted in the context of the Federal Tort Claims Act, 28 U.S.C. § 2680, it is "hard to think of any governmental activity on the 'operational level,'[2] ... which is 'uniquely governmental,' in the sense that its kind has not at one time or another been, or could not conceivably be, privately performed." *Indian Towing Co. v. United States*, 350 U.S. 61, 68, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955). The converse is also true—it is hard to imagine any act that might lead to a finding of government "operator" liability that could not be recharacterized at a higher level of abstraction as a uniquely governmental activ-

ity. For example, in reading § 9620(a)(1) to provide only a limited waiver of the government's immunity, the dissent in *FMC Corp. v. United States Dep't of Commerce*, 29 F.3d 833 (3d Cir.1994), defined the government's activities at issue there as uniquely governmental, characterizing them in terms of the ultimate *purpose* for which they were performed—"winning a war." *Id.* at 847. We do not wish to overstate this point; the special treatment of state governments' proprietary activities under the negative commerce clause, see, e.g., *South–Central Timber v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), appears to have proven workable. But the *FMC* case at least suggests a nontrivial potential for confusion.

Furthermore, § 9607(d)(1) of the Act confers a defense on "all persons" "for costs or damages as a result of actions taken or omitted in the course of rendering care, assistance, or advice in accordance with the National Contingency Plan," but does "not preclude liability for costs or damages as the result of negligence." As it appears that such activities are primarily or exclusively governmental, creation of the defense suggests a congressional assumption that immunization of specific purely governmental activities required a specific provision. See 42 U.S.C. § 9605(a)(4); see also 40 CFR §§ 300.110, 300.115(b) (identifying membership of national and regional "response teams")

Section § 9607(d)(2) affords modest additional light. It gives state and local governments a partial defense against claims arising from their emergency remediation efforts, limiting their liability to cases of gross negligence or intentional misconduct. Both the majority and dissent in *FMC* reasoned that this provision bolstered their interpretations. But both assumed a proposition that was already embedded in Third Circuit law, that the federal government

---

1. The Supreme Court is now considering the criteria for a parent corporation's liability as "operator" where primary operational control is exercised by a subsidiary. See *United States v. Cordova Chemical Co. of Mich.*, 113 F.3d 572 (6th Cir.1997), *cert. granted sub nom. United States v. Bestfoods*, —— U.S. ——, 118 S.Ct. 621, 139 L.Ed.2d 506 (1997).

2. The term "operational" is used by the Court here in contradistinction to activities excluded from liability by the "discretionary function" exception to the FTCA's waiver. See, e.g., *United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

waiver does *not* embrace pollution caused by the federal government's hazardous waste "clean-up" efforts. Compare 29 F.3d at 841 with *id.* at 848 n. 2. We have never addressed that issue, so our circuit law contains no such premise, and resolving the issue would carry us far from this case. Thus the differing analyses voiced in the Third Circuit do not seem relevant in our context. We think the special exception tends to cut against the government's theory. CERCLA abrogates state and local government immunity in terms virtually identical to the waiver of federal immunity, see 42 U.S.C. § 9601(20)(D), so the exclusion of liability for emergency remediation efforts seems to imply a background assumption that the waiver would otherwise extend to such a typical governmental activity.

Finally, although the precise meaning of § 9620(a)(1)'s waiver language was not directly before the Court in *Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1, it characterized § 9601(20)(D), the almost identically worded provision subjecting states to liability, as "unequivoca[l]" and "unqualified," 491 U.S. at 10, 109 S.Ct. at 2279, indicating that the statute's most authoritative reader may not be inclined to view the waiver as hedged by unwritten exceptions.

In reaching this conclusion we do not at all rely on one argument urged by the District, namely, that the "remedial" nature of CERCLA warrants broad governmental liability. Compare *FMC*, 29 F.3d at 840–41. We have recently expressed our general doubts about the canon that "remedial statutes are to be construed liberally," since virtually any statute is remedial in some respect. See *Ober United Travel Agency, Inc. v. United States Dep't of Labor*, 135 F.3d 822, 825 (D.C.Cir.1998). To paraphrase Judge Bork, who was referring to the "scarcity" rationale for broadcast regulation:

> Since [remedial character] is a universal fact, it can hardly explain [liberal construction] in one context and not another. The attempt to use a universal fact as a distinguishing principle necessarily leads to analytical confusion.

*Telecommunications Research and Action Center v. FCC*, 801 F.2d 501, 508 (D.C.Cir. 1986). Moreover, the canon appears to assume a unidirectional statutory purpose, so that the "liberal" interpretation would be the one best effecting that sole purpose. But in fact statutes necessarily reflect a legislative balancing of competing purposes. See, e.g., *Rodriguez v. United States*, 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393–94, 94 L.Ed.2d 533 (1987). Here, for example, it is unclear why shifting part of the clean-up cost from one pocket (the District) to another (the United States) is especially "liberal." Of course proliferation of accessible pockets might help clean up hazardous waste and spread risk; the federal government's pockets are deep and it is a risk-spreader without peer. But in some situations the statute explicitly calls for reimbursement of the United States for clean-up costs it incurs, see 42 U.S.C. § 9607(a)(A), making clear the presence of additional purposes. Cf. *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 157 (7th Cir.1988).

We thus at last reach the question of whether the government's acts in relation to Penn Mine, including the regulatory *and* the potentially private acts pointed to by the District, made the government the mine's operator.

* * *

■ CERCLA defines "owner or operator" at § 9601(20)(A)(ii), as "in the case of an onshore facility or an offshore facility, any person owning or operating such facility." As the Seventh Circuit has said of this virtually circular definition, "the statutory terms have their ordinary meanings rather than unusual or technical meanings." *Hines Lumber Co.*, 861 F.2d at 156. Standard dictionary representations of ordinary language tell us that to "operate" means to "direct the working of; to manage, conduct, work (a railway, business, etc.)," or "to manage and put or keep in operation whether with personal effort or not." The Oxford English Dictionary (2d ed.1989); Webster's Third New International Dictionary (1967). These match our own understandings. The appearance of "manage" in both definitions is un-

surprising, and conjures up a person or party exercising hands-on control.

The dominant explication of the language, adopted by the First, Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits, has looked to actual control, seeing an "operator" as someone actively involved in running the facility, typically on a day-to-day, managerial basis. See, e.g., *United States v. Cordova Chemical Co. of Mich.*, 113 F.3d 572, 579–81 (6th Cir.1997); *Redwing Carriers, Inc. v. Saraland Apts.*, 94 F.3d 1489, 1504–05 (11th Cir.1996); *Schiavone*, 79 F.3d 248, 253–54 (2d Cir.1996); *United States v. Gurley*, 43 F.3d 1188, 1193 (8th Cir.1994); *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992 F.2d 401, 408 (1st Cir.1993); *Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1220–22 (3rd Cir.1993); *Joslyn Manuf. Co. v. T.L. James & Co., Inc.*, 893 F.2d 80, 83 (5th Cir.1990); *Hines Lumber Co.*, 861 F.2d at 157–59 (7th Cir.1988); cf. *In re Bergsoe Metal Corp.*, 910 F.2d 668, 672 (9th Cir.1990) (addressing secured creditor provision). But the Fourth Circuit has opted for a broader interpretation of "operator," taking it to include not only those persons with actual control over a facility, but also "a party who possessed the authority to abate the damage caused by the disposal of hazardous substances but who declined to actually exercise that authority by undertaking efforts at a cleanup." *Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 842 (4th Cir.1992). As we shall explain, we find the District's claim inadequate even under the authority-to-control test, and thus need not make a final choice between the two interpretations.

Looking first for the exercise of any managerial control, we find none. The detailed facts are set forth, as we have said, in the district court's opinion, and also in the Revised Joint Statement of the Parties ("R.S."). First, the price restrictions imposed by the government on the zinc market, while intended (in part) to protect its own efforts to acquire zinc for munitions production, did not amount to operation of any mining facility. This is not changed by the fact that the government allowed increments above the base controlled price for production in excess of the controlled levels. These steps represent a standard governmental device for reconciling an interest in keeping prices low (here, to make the war effort cheaper) with the conflicting interest in generating an adequate supply. They are, of course, variations on the ways a private buyer might offer special price advantages to generate a supply that would otherwise be unavailable, but they do not bring the government as buyer one whit closer to managerial control.

Second, the government's regulations governing labor mobility and hours, while they may have made continuation of operations easier for the mine operators by reducing the miners' potential rewards in alternative fields, and conceivably by extracting more work per dollar than would otherwise have been extractable, did not give the government the kind of direct managerial or supervisory authority over Penn's workforce that is a crucial component of operator liability under the actual control test. See *United States v. Vertac Chemical Corp.*, 46 F.3d 803, 809 (8th Cir.1995); *Hines Lumber Co.*, 861 F.2d at 158; *United States v. Dart Indus., Inc.*, 847 F.2d 144, 146 (4th Cir.1988). Compare *FMC*, 29 F.3d at 843 (majority asserting government "participat[ion] in the management and supervision of the labor force") with *id.* at 853 (dissent asserting that government merely helped employees overcome shortages of housing and community services and assisted the firm in reducing labor strife and absenteeism).

Third, the government's financial backing of the mine, which appears to have been made as an advance against Shawmut's sales, was not sufficient to suggest control. Section 9601(20)(A)'s exemption from owner liability for nonmanaging security interest holders is again relevant here. Without "actually participating in the management or operational affairs of a vessel or facility," § 9601(20)(F)(i)(I), no mere financial backer—even one holding title to a facility as security for debt—is liable under CERCLA; see also *In re Bergsoe Metal Corp.*, 910 F.2d at 671. Mere unsecured credit, unaccompanied by the "actual" managerial control needed for a secured creditor, clearly cannot give rise to operator liability.

Fourth, entering into an output contract does not make the government an operator. The output contract between the U.S. and Penn Mine merely reflected the monopsonistic wartime market and the willingness of the government to pay substantial premiums in order to meet its metals needs. *Hines Lumber Co.* is pertinent again. An operating company, itself clearly responsible under CERCLA, sought to bring into the ring of CERCLA liability the firm that had supplied it with its key chemical input. The supplier had the contractual power to inspect the production process for quality control purposes, since the product was to be sold under that firm's trademark. But the supplier had no control of the work, no right to choose employees or to direct their activities. It thus had no operating control. 861 F.2d at 158.

Whether taken severally or jointly, these factors do not support the District's claim of actual governmental control.

■ We now return to the possibility of liability through mere authority to control. There are two aspects of the relationship between the government and Shawmut from which one might spin such a theory. First, the War Production Board had contingent authority to seize any production facilities. In the early phases of World War II this was limited to facilities that refused to supply goods or refused to do so at reasonable prices; authority was later added to seize facilities that failed to produce because of labor stoppages. See R.S. ¶¶ 28–33. (Here we assume, in favor of the District, the correctness of its analysis of the controlling statutes.[3]) But whatever the scope or statutory validity of an "authority to control" test, we do not see how (subject to a qualification discussed below) it could encompass a contingent authority that was never triggered.

Alternatively one could devise an "authority" claim from provisions in the purchase-and-loan contract between the United States

(in the guise of the Metals Reserve Corporation) and Shawmut. But that contract granted the government only the right "to inspect said Mine and said Mill and to examine and audit, or cause to have examined and audited, any of [Shawmut's] books and records." These inspection rights carried with them no managerial prerogatives or authority. Further, the contract explicitly assigned to Shawmut full responsibility for the mine's "dewatering," "rehabilitation," "conversion," and "*operat[ion]*," in conformity with "good mining and engineering practice." True, the contract also states that Shawmut's performance of these duties will be "in conformity with [its] proposals therefor heretofore submitted to and approved by the War Production Board." But a contractual right to ensure that a producer follows some agreed plan is hardly authority to control operations. Cf. *Hines Lumber Co.*, 861 F.2d at 158 (declining to infer "control" from non-producer's right to inspect and from producer's obligation to keep plant in compliance with environmental rules).

■ Under either the "authority" or the conventional "actual control" theory, one might assign CERCLA responsibility on the basis of duress. Suppose one party, without itself exercising day-to-day control, wielded such power over a hands-on operator that the operator was merely its pawn. The Mafia, for example, might exercise such power over a legally independent firm, so that the Mafia might properly be held liable for the firm's acts just as any party is held liable for the acts of its agents. For our purposes, one might try to ground such a duress theory in two factors—the War Production Board's contingent power to seize the mine if it refused to supply goods (or refused to do so at reasonable prices), or from the government's order closing gold mines. But an argument from duress does not work on the record here.

First, consider the gold mining restriction. If a mine could be used for gold or zinc, and

---

3. In fact the District's reading seems correct. Section 9 of the Selective Training and Service Act of 1940, Ch. 720, 54 Stat. 892 (1940), imposed on firms an obligation to comply with the President's orders "for such product or material as may be required," and authorized him to seize plants that refused to produce or refused to do so at reasonable prices. This authority was expanded in 1943 to include authority to seize facilities useful to the war effort in case of labor stoppage. War Labor Disputes Act, Ch. 144, 57 Stat. 164, § 3 (1943).

the government forbade gold mining, there might be some situations where the ban left the owner no choice but to produce zinc or suffer serious out-of-pocket losses. But it appears that the Penn Mine had no potential function as a gold mine, so that the gold-mining ban did not put Shawmut in any such bind. In fact Shawmut operated a gold mine elsewhere. Let us suppose, for a moment, that the gold-mining ban had induced Shawmut to close this mine. The availability of equipment and miners released from the gold mine might well have made it *easier* to mine zinc at Penn Mine, and conceivably evidence about market conditions for mining equipment might prove that its displacement from gold mining placed Shawmut in the kind of bind we considered for the hypothetical mine that could produce either gold or zinc. But the District offered no such evidence. This is no surprise: in fact Shawmut continued to produce gold at its gold mine through the war. R.S. ¶ 71. No duress claim can be grounded in the evidently ineffectual gold-mining ban.

Similarly, one can imagine a party so threatened by the War Production Board's seizure power as to have been driven to produce against its will. But no such threat seems ever to have loomed here. The district court summarized the record as showing that Shawmut's production efforts were the result of consensual agreement with the government, 948 F.Supp. at 90, and the District does not dispute the finding. Indeed, it appears from the record that Shawmut sought out government financing on its own initiative in order to reopen Penn Mine. This view of the operations as consensual is of course further confirmed by the government's offers of increased prices; the carrot prevailed, not the stick. The differences between the government's actions here, and those of any buyer who is very determined to elicit a supplier's production, are not enough to make it an operator under CERCLA.

\* \* \*

The judgment of the district court is

*Affirmed.*