P. Wesley **FOSTER, Jr.,** Plaintiff,

v.

**UNITED STATES of America, et al.,** Defendants.

No. Civ.A. 95–722(TPJ).

United States District Court, District of Columbia.

Jan. 29, 2001.

Barbara S. Wahl, Donald B. Mitchell, Jr., Andrew C. Cooper, Arent Fox, Washington, D.C., for plaintiff.

Lisa Bell, Corey Buffo, Office of Corporation Counsel for the District of Columbia, Land Use and Public Works Section, Washington, D.C., Mary Edgar, Environmental and Natural Resources Division, Environmental Defense Section, U.S. Department of Justice, Washington, D.C., for defendant.

## DECISION & ORDER

JACKSON, District Judge.

This case is presently before the Court as a continuation of an action by a purchaser of a vacant 7.98–acre tract of land in southwest Washington, D.C. (the "Property") to obtain contribution under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), § 113(f), to the cost of removing subterranean contaminants belatedly discovered to infest the Property. The contaminants are impediments to its development and have diminished its value. The sole remaining defendant, the District of Columbia (the "District"), disclaims any responsibility for the presence of the contaminants and asserts that the contaminants originated as waste products from the manufacture of munitions on the adjoining property owned by the United States, its former co-defendant, on which a federal military arsenal was situated for much of the 19th century.

### I.

The controversy commenced in August 1994, with plaintiff's original complaint being assigned to District Judge Charles R. Richey. Proceedings before Judge Richey culminated in cross-motions for summary judgment upon which Judge Richey ruled in March, 1996, in a comprehensive opinion reported at 922 F.Supp. 642 (D.D.C.1996). Judge Richey granted and denied all motions in part, resolving some issues while leaving others for trial. Settlement negotiations proceeded in tandem with discovery, and trial dates were repeatedly postponed upon representations of all parties

that settlement was imminent. Upon Judge Richey's death, the case was randomly reassigned to this district judge, who postponed trial twice again to afford an opportunity for mediation and to enable a reported settlement to be finalized. Plaintiff ultimately settled with the defendant United States in June 1999.

Yet another trial date was vacated in May, 2000, in favor of yet another settlement conference at which the District announced for the first time that it had no interest in settlement at any price or upon any terms. The case was then finally, called for non-jury trial on August 21, 2000.[1]

Upon the following facts, as found by the Court in accordance with Fed.R.Civ.P. 52(a) following trial without a jury, and the conclusions of law drawn therefrom, for the reasons stated the Court will enter judgment for the plaintiff as hereinafter set forth.[2]

## II.

In July, 1985, Riverside Associates ("Riverside"), a limited partnership of which plaintiff P. Wesley Foster was one partner, purchased the Property from the United States at a General Services Administration ("GSA") auction for $3.5 million.[3] Riverside obtained a $3.65 million purchase money loan for the Property on June 20, 1985. Consistent with real estate lending practice at the time, this loan commitment made no mention of an environmental assessment of the Property. The GSA transferred the Property to Riverside on July 30, 1985 by a quitclaim deed. The Property was unzoned at the time of purchase, making it less valuable than a com-

---

1. Pursuant to Fed.R.Civ.P. 37(c), the Court precluded the District from calling four witnesses whom it first disclosed on April 27, 2000, nearly a month after discovery had closed for the last time, two weeks prior to the anticipated May 15, 2000 trial date, and nearly six years following the inception of the case. The Court also precluded the District from calling an expert witness retained by the United States in the absence of the express written consent of the U.S., as required by the terms of the settlement with the U.S. The District had failed to obtain such consent. The District was permitted to call any witnesses disclosed previously but chose not to do so, other than to submit the written testimony of the two custodians of records.

   Fed.R.Civ.P. 37(c)(1) explicitly provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." "The sanction of exclusion is 'automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.'" *NutraSweet Co. v. X–L Engineering Co.,* 227 F.3d 776, 785–786 (7th Cir.2000) (affirming district court's decision based on Fed.R.Civ.P. 37(c)(1) in a CERCLA case to limit a party's expert testimony at trial to his initial expert report and to exclude a supplemental expert report not timely filed and any testimony

based thereon); *see also Grajales–Romero v.. American Airlines Inc.,* 194 F.3d 288, 297 (1st Cir.1999) (finding no abuse of discretion in district court's decision under Fed.R.Civ.P. 37(c)(1) to forbid witness substitution when new witness was not properly disclosed during the course of discovery).

   This Circuit has stated that "in determining whether a severe sanction is justified, the district court may consider the resulting prejudice to the other party, any prejudice to the judicial system, and the need to deter similar misconduct in the future." *Bonds v. District of Columbia,* 93 F.3d 801, 808 (D.C.Cir.1996) (district court abused discretion when it prevented the District from offering *any* fact witnesses at trial as a discovery sanction under Fed.R.Civ.P. 37(b)(2) and (d) rather than imposing lesser sanction of prohibiting witnesses whom plaintiff had not deposed). This Court notes that the *Bonds* decision did not involve Fed.R.Civ.P. 37(c).

2. Direct testimony in this case was received by written declaration, with the witnesses then subject to live cross-examination and redirect before the Court.

3. The Property, listed as Squares 602 and 604 in the District of Columbia land records, is bounded on the north by the northern boundary of Q St. SW, on the south by the northern boundary of S St. SW, on the east by Second St. SW, and on the west by Fort Leslie J. McNair.

parable piece of property that had already been zoned.[4]

In due course in 1989, Riverside obtained W1 and W2 mixed-use zoning for the Property and refinanced its loan with a second bank, Crestar Bank, for $11.2 million. Reflecting increased public awareness of the significance of hazardous wastes on real property slated for development, the new loan commitment required an environmental report. Riverside hired Environmental Strategies Corporation ("ESC") in September 1989 to perform a "Phase I" environmental evaluation of the Property. ESC's report gave no indication that the Property had been used for industrial purposes or for dumping.

In 1990, Riverside entered into a joint venture with Markborough Properties, a Canadian developer, for the purpose of developing the Property. As a precondition to its investment, however, Markborough hired another engineering firm to perform a second environmental evaluation, including analysis of several soil borings taken from the Property. In the fall of 1990, Markborough informed Riverside that its environmental studies revealed the presence of mercury, lead, and zinc contamination at depths up to 20 feet below the surface of the Property. As a result, Markborough withdrew from the joint venture. The Court finds that neither the plaintiff Foster nor the other members of Riverside were aware of any lead or mercury contamination on the Property prior to their receipt of the Markborough Properties study in late 1990.

Upon learning of the contamination, Crestar Bank called for full repayment of the $11.2 million loan. Plaintiff P. Wesley Foster was the only Riverside partner able to repay the loan personally, and as a result he became the sole general partner of Riverside in December, 1991. In 1992, Riverside obtained Planned Unit Development ("PUD") zoning for the Property, which would enable Riverside to construct a mixed use (residential and commercial) development on the Property at a higher density than the initial W1 and W2 zoning. The PUD zoning allows for a commercial and residential mix, with approximately 500 units of housing and one million square feet of commercial space as well as below-grade parking. Any subsurface development of the Property will, however, require removal of the lead and mercury contamination.[5]

Riverside has made no money on the Property. It has, in fact, expended approximately $13.2 million to date on loan interest, environmental studies, and legal costs, not to mention approximately $3.1 million in property taxes it has paid to the District of Columbia.

Plaintiff filed this lawsuit on April 14, 1995 against the District of Columbia and the United States seeking to recover his past and future response costs for addressing the environmental contamination. As noted above, plaintiff has reached a settlement agreement with the United States.

4. Uncontroverted testimony established that $3.5 million was a price that reflected the risks of investment resulting from both the need to obtain favorable zoning and the market for developing the Property. The District points out that the GSA sold the Property with an "as is" clause. This Court finds the "as is" clause to be irrelevant. Bernard Maltby testified that before the GSA sells any property, the holding agency (the agency using the property immediately prior to conveyance) is required to remove any hazardous substances. Accordingly, property with an "as is" clause contains an underlying presumption that it is free from hazardous substances. By purchasing the Property with an "as is" clause, the plaintiff in this case did not forego his right to seek contribution for environmental contamination on the Property of which he was unaware at the time of purchase.

5. The District submits that one remediation option is "blacktopping," namely, covering the surface of the Property and building on top of that foundation, rather than developing the Property's subterranean space. This Court finds that the plaintiff is entitled to develop the Property in the manner that he chooses. His "remediation" options are not limited to the least expensive.

Plaintiff's remaining claim against the District of Columbia, which was tried to this Court, depends upon a finding that the District "owned or operated" the Property at the time of contamination and / or "arranged for disposal" of the contamination on the Property within the meaning of CERCLA. See 42 U.S.C. § 9607(a)(2) and (a)(3).

### III.

The relevant trial testimony focused on the history of the James Creek and James Creek Canal (the "Canal").[6] The James Creek flowed southward from Capitol Hill to the Anacostia River, traversing the western portion of the Property, and formed the eastern boundary of the Washington Arsenal. In the 1870s, the James Creek was canalized. Although both the east and west sides of the Canal were walled from G St. to P St. SW, below P St. SW to the Anacostia River the Canal was contained by a masonry wall only on its western side bordering the Washington Arsenal.[7]

As James Creek in its natural state had been, the Canal was a slow-moving, tidal body, navigable during high tide by small craft. The Canal formed an integral part of the District of Columbia sewer system. Sewage flowed into the James Creek Canal from the sewage discharge pipe of the Washington City Canal. As noted above, south of P St., the eastern side of the Canal was not walled, so the Canal's eastern bank was undefined and varied with the tidal flow from 80 to as much as 300 feet wide in the portions of the Canal that flowed through the Property. Releases of sewage into the Canal, combined with the tidal flow, deposited solids on the land to the east of the Canal.

From approximately 1874 until the advent of "home rule" in the mid 20th century, the District of Columbia was governed by three commissioners, one of them being a U.S. Army Corps of Engineers officer known as the Engineer Commissioner. The District had the juridical status of a municipal corporation. Congress gave the commissioners authority over numerous municipal functions, including the power to regulate the public sewers and waste collection and disposal, as well as to make and enforce police regulations necessary to protect health and property. The Sewer Division of the District government was created in 1891, and an 1899 Act of Congress gave the D.C. commissioners control over the maintenance, repair, and dredging of the James Creek Canal.

It should be noted that at no point did the District of Columbia actually appear to own the Property. In fact, the locus of the title to the Canal and marshlands adjacent to the Canal is obscure until December, 1941, when the United States took formal ownership of the Property in fee simple by eminent domain. The United States owned the Property thereafter until it was sold to Riverside on July 30, 1985. The United States built temporary office buildings on the Property and the adjoining property to the south which were demolished in the 1970s and 1980s, when the United States classified the Property as surplus. However, the evidence shows that, even in the absence of title, the District exercised dominion and control over the use of the Canal and lands to the east

---

6. The evidence concerning the history of the Property comes largely from the testimony of plaintiff's expert witness Dr. William Haskett. Dr. Haskett is a retired Professor of History at the University of the District of Columbia who conducted extensive archival research concerning the history of the Property.

7. The Washington Arsenal was a military reservation originally known as the Washington Barracks and now known as Fort McNair. It operated as a military arsenal from the early nineteenth century to 1881. During that time, lead and mercury were used for the manufacture of bullets and percussion caps, but there is no evidence that those munitions manufactures occurred after 1881. As of 1881, the James Creek Canal was open and unfilled, and the land to the east was tidal marshland.

of the Canal, including the Property, up to 1941.

Beginning in approximately 1904, the District operated a public dump in the vicinity of the Property, and the James Creek Canal functioned as an open sewer, leading to complaints addressed to the District Engineer Commissioner about the unsanitary conditions of the Canal. Perhaps as a result of these complaints, the District of Columbia government eventually undertook to fill the Canal. By 1912, the District had filled the Canal as far south as N St. SW, and by 1916 had progressed through P St. SW. To allow continued disposal of the city's sewerage during the filling process, the District installed a sewer line (known as a "trunk line") in the eastern bank of the Canal as filling extended southward. In April 1921, the portion of the trunk line traversing the Property was completed. By 1930, the District had filled the Canal through T St., south of the Property. The portion of the Canal crossing the Property had thus been completely filled.

During the same years, the District was also actively engaged in filling the tidal wetlands to the east of the Canal with waste materials to bring the marshy eastern land up to the same level and grade as the other land in the vicinity. The fill materials included ashes and street sweepings. It is clear that the District government controlled the filling of both the Canal and marshlands to the east: the Engineer Commissioner forbade other parties, including the Washington Barracks, from using the land as a dump. Dumping space for waste was scarce, then as now, and the right to dump and fill the land adjoining the Canal, including the Property, was a valuable privilege.

The testimony at trial identified household refuse, ashes, and street sweeping as among the city wastes used to fill the Canal and the lands to its east. This testimony was consistent with the geological findings that the subterranean material on the Property contained large quantities of ash, as well as cinders, bricks, and other man-made debris similar to the soil composition of other land to the east and to the south of the Property.

### IV.

In 1990, confronted with Markborough's discovery of the lead and mercury contamination, Riverside retained ESC to conduct further extensive testing on the Property. In the fall of 1990, ESC conducted numerous tests, including 196 soil borings and several groundwater monitoring wells. The soil boring samples were collected at surface level, and at depths of 5, 10, and 15 feet below grade throughout the Property. Samples were also collected at 20 and 25 feet below grade in the former Canal area, the westernmost 50 feet or so of the Property. In 1994, ESC conducted an additional investigation of the Property, including five new borings, with two samples per boring. The soil testing work provided a comprehensive picture of the subterranean composition of the Property, as presented by plaintiff's expert, Mr. Kent Campbell, an environmental geologist with 15 years' experience in conducting environmental contamination assessments and remediations over the course of his career.

The Property is contaminated, Campbell testified, with lead and mercury, with lead being the primary contaminant. Lead is present throughout the Property, not merely in the former Canal area. The lead contamination was also found at varying depths, indicating a uniform vertical distribution beneath the surface. In other words, the contamination is not all concentrated at one vertical level, but is dispersed throughout, from the surface to a depth of 20 feet.

The data show that the lead contamination is associated with the "fill material," namely, the material that was used to fill both the Canal and the wetlands to the east of the Canal, as opposed to the "natural soil." All of the 54 soil samples that contained lead levels greater than 1,000

parts per million (ppm) came from the fill material; none came from the natural soil. Of the 41 samples that were taken from natural soil, only one contained a lead level greater than 100 ppm, whereas 39 out of the 54 soil samples containing lead concentrations greater than 1,000 ppm were extracted from fill material located in the Canal area.

Based on elevation studies on the Property and "test pit" studies conducted in 1941 by the United States, Mr. Campbell concluded that the Property had been filled as of 1941, when the United States acquired the Property. The elevation range of the Property in 1941 is consistent with the elevation of the Property and surrounding areas in the 1970s and 1980s. The "test pits" from 1941, used to identify sub-surface materials up to a depth of 10.5 feet, contained large amounts of "fill material," including ashes. A similar soil composition was found in the land to the South of the Property when the U.S. government conducted a study of that property in the 1990s in preparation for the construction of a recreation facility at Fort McNair. It is Mr. Campbell's conclusion, and this Court's as well, that the lead contamination was introduced onto the Property as part of the material used to fill the Canal and thereafter the wetlands to the east of the Canal, all done under the auspices of the District of Columbia. Ash often contains high concentrations of metals. When coal or solid waste is incinerated, those elements do not burn. They remain in the residual material: the ash. Lead concentrations ranging from 2,000 ppm to 5,000 ppm are common in ash formed by burning solid waste or coal, and the concentrations found on the Property are consistent with those numbers. Mr. Campbell's testimony also addressed, and excluded, other possible sources of the lead and mercury contamination.[8]

### V.

In *Foster v. United States, supra,* Judge Richey held that plaintiff was not entitled to recover all costs of remediation of the site from the United States and the District under CERCLA § 107(a), 42 U.S.C. § 9607(a), because Riverside was not an "innocent landowner" within the meaning of the statute: the Riverside partners, he found, were sufficiently knowledgeable to have suspected the presence of hazardous substances on the Property. *See* 922 F.Supp. at 652–57.

Plaintiff therefore pursues this action as one for contribution to the costs of removal or remediation as allowed by CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), which provides:

---

**8.** Those other possible sources included: (1) percolation through the soil from the surface of already-filled lands; (2) sediments from the Potomac or Anacostia Rivers carried onto the Property by tidal action; (3) migration of contaminants from an off-site source through groundwater flow; and (4) the activities of the Washington Arsenal in the 19th century.

If (1) were the source, the highest concentrations of contaminants would be found at the surface of the Property, and the lead concentrations would drop at increasing depths. In fact, the contaminants were evenly distributed vertically beneath the surface, with relatively low concentrations at the surface itself. If (2) were the source, the only contaminants would be found at sea level and below. However, the Property surface is located 14 feet above sea level, and the contaminants are evenly distributed vertically beneath the Property, including at levels above sea level. For a similar reason, (3) cannot be the source. Groundwater on the Property is located approximately 14 feet below the surface grade, and if it were the source of the contaminants, those contaminants would be found at depths of 14 feet and greater. However, on the Property, the contamination is evenly distributed and some of the contamination is found at depths of less than 14 feet. Finally, the Washington Arsenal manufactured munitions in the 19th century, but stopped all such manufacture in 1881, before the Canal and wetlands to the east were filled. If the contamination came from the Washington Arsenal munitions manufacture, it would be found only at the bottom of the Canal and / or at the 19th century surface level of the lands to the east of the Canal, not in the fill area which was deposited in the 1920s, nor would the even vertical distribution of contamination be observed.

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this Section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. *In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.* Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

42 U.S.C. § 9313(f)(1) (emphasis added). A contribution claim under § 9613 requires first that liability be established and then that the contribution be allocated.

■ A four-part test must be met to establish a defendant's liability under CERCLA: (1) the site in question is a "facility;" (2) the defendant is a "responsible person" under § 9607; (3) there was a release of hazardous substances at the facility; and (4) such release caused the plaintiff to incur response costs consistent with the national contingency plan. *See* 42 U.S.C. § 9607(a); *see also Environmental Transp. Sys, Inc. v. ENSCO, Inc.,* 969 F.2d 503, 506 (7th Cir.1992); *United States v. Alliedsignal,* 62 F.Supp.2d 713, 725 (N.D.N.Y.1999). Once a court has determined that a defendant is liable, it proceeds to allocating response costs under § 9613(f)(1) using equitable factors.

CERCLA defines a "facility" as, among other things, "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C.

§ 9601(9)(B).[9] "The words of the statute suggest that the bounds of a facility should be defined at least in part by the bounds of the contamination." *United States v. Township of Brighton,* 153 F.3d 307, 313 (6th Cir.1998) (finding entire dump property to be a "facility" even though town residents generally disposed of their waste in one particular corner).

■ This Court finds that the entire Property constitutes a single "facility." The land on which the Property is located consists of a former canal and adjoining wetlands, all of which were filled by the District over approximately the same time period with largely homogeneous material. The Property is an area where hazardous substances (lead and mercury, among others) have been "deposited," "disposed of," "placed," or "otherwise come to be located." This Court does not find any basis in the evidence for treating the Property as two or more "facilities."

An "owner or operator" for CERCLA purposes is, "in the case of an onshore facility or an offshore facility, any person owning or operating such facility." 42 U.S.C. § 9601(20)(A)(ii). Appellate courts have interpreted an operator as (1) "someone actively involved in running the facility, typically on a day-to-day, managerial basis," (the majority "actual control" theory); or (2) "not only those persons with actual control over a facility, but also 'a party who possessed the authority to abate the damage caused by the disposal of hazardous substances but who declines to actually exercise that authority by undertaking efforts at a cleanup'" (the minority "authority to control" theory). *East Bay Municipal Utility District v. U.S. Dep't of Commerce,* 142 F.3d 479, 485 (D.C.Cir. 1998) (internal citations omitted). Although the D.C. Circuit declined to decide which interpretation applies in this Circuit,

---

**9.** Alternatively, CERCLA defines "facility" as "any building, structure, installation, equipment, pipe or pipeline .... well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or air-

craft." 42 U.S.C. § 9601(9)(A). The Property qualifies as a "landfill" under this definition. *See United States v. Township of Brighton,* 153 F.3d 307, 322 (6th Cir.1998) (Moore, J. concurring).

the Supreme Court defined the term "operator" as:

> simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste or decisions about compliance with environmental regulations.

*United States v. Bestfoods et al.*, 524 U.S. 51, 66–67, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).

■ This Court finds that by any definition, the District of Columbia qualifies as an "owner or operator" of the Property at the time hazardous substances were deposited thereon. The District of Columbia, in particular its Engineer Commissioner and its Sewage Division, exercised authority over the James Creek Canal and adjoining lands to the east, and it directed the filling of the Canal from the early 1900s to 1930. The District also used the lands to the east of the Canal, of which the Property is a part, as a public dump and refused to allow others to utilize it for the same purpose. The testimony at trial established that the District exercised dominion and control over the Property until the U.S. acquired formal ownership in 1941. All of these facts demonstrate that the District had both authority and actual control over the Property during that time and specifically managed waste operations on the Property.

Upon the same evidence, this Court finds that the District is also liable as a party who "arranged for disposal" of hazardous wastes. A potential contributor is liable if it: (1) arranged for the disposal of (2) hazardous substances (3) owned or possessed by it. *See* 42 U.S.C. § 9607(a)(3); *see also Alliedsignal*, 62 F.Supp.2d at 726. Municipalities are not exempt from this provision of CERCLA. *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198–1201

(2d Cir.1992) (municipality arranging for disposal or treatment of municipal waste, including household waste, may be held liable for contribution or response costs under CERCLA for subsequent cleanup efforts). It is clear from the testimony in this case that the District arranged for the disposal of municipal waste on the former dump site abutting the James Creek Canal to the east, including the Property. The testimony also established that the District arranged for the disposal of municipal waste in the James Creek Canal itself as part of its filling operations in the portion of the Canal traversing the Property up to 1930. The waste contained, among other items, lead, a "hazardous substance" under CERCLA. *See* 40 C.F.R. § 302.4. The environmental tests on the Property established that the lead on the Property was present in the "fill" rather than in the "natural soil," indicating that the hazardous substances were contained in the material that the District used as fill, municipal refuse, which was "owned or possessed" by the District.

Finally, there is no doubt that a "release" of "hazardous substances" occurred on the Property. CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment ..." 42 U.S.C. § 9601(22). The evidence at trial showed that the lead, found in the fill material, came from a "release" in the form of dumping or otherwise depositing the fill material onto the Property during the 20th century.

## VI.

The plaintiff in this case seeks (1) recovery of the costs he has spent on environmental investigations of the Property, totaling $114,270.28; and (2) a declaratory judgment that the District is liable to the plaintiff for necessary "response costs" to be incurred by plaintiff on the Property after the entry of judgment in this case.

■ A party liable for the presence of hazardous substances under CERCLA may be charged for "the cost of ascertaining the danger posed by an actual or threatened release of hazardous substances," including environmental testing, subject to two statutory limitations that apply to all "response costs." *Johnson et al. v. James Langley Operating Co. Inc.*, 226 F.3d 957, 963 (8th Cir.2000). First, "response costs must be caused by an actual release or a threatened release." *Id.* In this case, there was an actual release of hazardous substances on the Property. Second, the response costs must be "necessary" and "consistent with the [National Contingency Plan]." *Id.* at 963–964.

To recover, plaintiff must demonstrate that his response costs were "necessary" within the meaning of 42 U.S.C. § 9607(a)(4)(B). In his March 29, 1996 ruling on cross motions for summary judgment, Judge Richey granted the defense motion for summary judgment with respect to plaintiff's past investigatory costs. *See Foster v. United States*, 922 F.Supp. 642, 652 (D.D.C.1996). Holding that because plaintiff's decision to investigate the environmental condition of the Property was taken "to further identify barriers to development of the Site" and not "in response to a perceived threat to health or the environment," Judge Richey concluded that plaintiff failed to establish that Riverside's investigatory costs were "necessary and consistent with the National Contingency Plan." *See Foster*, 922 F.Supp. at 652–653. This Court will not disturb that ruling.

Foster's claim for future costs will depend on their consistency with the National Contingency Plan ("NCP"). Foster may obtain a judgment requiring the District to pay any such future costs that are consistent with the NCP, a showing that is left for the future. *See Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 844–845 (6th Cir.1994).

■ Once liability has been established, however, courts consider a number of factors in making contribution allocations under 42 U.S.C. § 9613. A court may consider "any factors appropriate to balance the equities in the totality of the circumstances." *Envtl. Transp. Sys.*, 969 F.2d at 509. Factors include:

(1) the ability of the parties to demonstrate that their contribution to a discharge release or disposal of a hazardous waste can be distinguished;

(2) the amount of hazardous waste involved;

(3) the degree of toxicity of the hazardous waste involved;

(4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or environment.

*United States v. R.W. Meyer, Inc.*, 932 F.2d 568, 571 (6th Cir.1991). In addition to those criteria, a court "may consider the state of mind of the parties, their economic status, any contracts between them bearing on the subject, any traditional equitable defenses as mitigating factors and any other factors deemed appropriate to balance the equities in the totality of the circumstances," including "the relative culpability of the parties." *Id.* at 572 & n. 6. Another factor is "the economic benefit associated with the releases of the hazardous substances that each party realized." *Dent v. Beazer Materials & Servs., Inc.*, 993 F.Supp. 923, 951 (D.S.C.1995). A court "may consider several factors, a few factors, or only one determining factor, . . ., depending on the totality of the circumstances presented to the court." *Envtl. Transp. Sys.*, 969 F.2d at 509.

This Court finds from the facts proved at trial and summarized above that the District—and only the District—was integrally and actively involved in the disposal of the hazardous waste found on the Property in filling both the Canal and the adjoining wetlands. There is no evidence to implicate any other source. The District derived an economic benefit from using the Property to discard its municipal wastes, and, in reserving that benefit for its own exclusive use, eliminated the possibility that others might have to share responsibility for sanitizing the Property. The plaintiff certainly shares no responsibility for the presence of contaminants, nor did he agree to assume the risk thereof by his acquisition of the Property by quitclaim deed in an "as is" condition from the United States. Whatever the effect of the language of the conveyance with respect to the liability of the United States (now rendered moot by the settlement), it did not inure to the advantage of the District—a non-party thereto, and certainly not an intended third-party beneficiary thereof— to relieve it of its statutory liability under CERCLA to contribute to the cost of remediation.[10]

The Court thus concludes that it would be inequitable to charge plaintiff with any portion of the remediation costs. Not only has plaintiff received no windfall—the Property was acquired at approximate fair market value unrelated to its contaminated condition—for over 15 years plaintiff and his partners have expended considerable moneys of their own in taxes (paid to the District, it should be noted), interest charges, and the cost of rezoning proceedings, not to mention their now unrecoverable expenses for environmental investigations, and the cost of this litigation, with no return on their investment to date and none likely in the future for some time to come. To the extent their investment in the Property eventually proves profitable, the District will share in the bounty in the form of increased tax revenues.

This Court concludes that plaintiff is entitled to a declaratory judgment that the District of Columbia is liable for 100% of plaintiff's necessary response costs consistent with the National Contingency Plan to be incurred by plaintiff after entry of judgment in this case. *See* 42 U.S.C. § 9613(g)(2), 28 U.S.C. § 2201, and 42 U.S.C. §§ 9607(a)(2) and (3). That this action is a contribution action under § 9613 rather than a straight recovery action under § 9607 does not preclude plaintiff from recovering one hundred percent of his clean-up costs. *See PMC, Inc. v. Sherwin–Williams Co.*, 151 F.3d 610, 616 (7th Cir.1998) (holding former owner liable for 100% of costs under § 9313 was not an abuse of discretion by trial court).

For the foregoing reasons, it is, this 29th day of January, 2001,

ORDERED, that judgment be entered for the plaintiff in accordance with the foregoing; and it is

FURTHER ORDERED, that this Court retains jurisdiction for the purpose of enforcement hereof.

---

10. The Court is informed that plaintiff's settlement with and release of the United States merely commits the United States to pay 60 percent of those remediation costs for which the District is *not* found liable.